1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

         Plaintiff,

    v.

JOSETH FORTINO SALGADO-
MARTINEZ,

         Defendant.

Case No.  19-cr-00389-CRB-1

**ORDER GRANTING MOTION TO
DISMISS INDICTMENT**

Defendant Joseth Salgado-Martinez was removed from the United States in February 2018 pursuant to an administrative removal procedure.  Soon afterwards, he reentered the United States. Salgado-Martinez is charged with illegal reentry after deportation, a violation of 8 U.S.C. § 1326. See Compl. (dkt. 1).  He now brings a motion to dismiss the indictment, arguing that his administrative removal violated his due process rights, and so cannot constitute the prior lawful deportation order necessary to establish the deportation element of the offense.  MTD (dkt. 39).

Because the Court concludes that Salgado-Martinez has established that he exhausted all administrative remedies available to seek relief against the administrative removal order, the deportation proceedings improperly deprived him of the opportunity for judicial review, and the entry of the administrative removal order was fundamentally unfair, the Court GRANTS the motion and dismisses the indictment.

I.      **BACKGROUND**

    A.     **Childhood and DACA Status**

Joseth Salgado-Martinez was born in Mexico on April 9, 1995.  See Falk Decl. Ex. A (DACA Application) (dkt. 34-1) at 2 of 6.  He came to the United States with his mother and sister

when he was between four and five years old.  See MTD at 1; see also id.; Salgado-Martinez Decl. (dkt. 38) ¶ 2.  Salgado-Martinez's father was already in California.  See Salgado-Martinez Decl. ¶ 2.  Salgado-Martinez's parents later had two more children, both United States citizens.  See Lawrence Decl. (dkt. 35) ¶ 4(d); see also id. ¶ 4.

Starting in kindergarten, Salgado-Martinez attended school in Hayward, California. Salgado-Martinez Decl. ¶ 6.  As a result, he speaks fluent English and is most comfortable speaking in English, although he speaks "non-perfect" Spanish to his parents.  Id.  Starting in seventh grade, Salgado-Martinez became "very cognizant that [he] was undocumented" and, as a result, began to associate with other undocumented people, some of whom "did not have the same kind of guidance" as he did and who engaged in "law-breaking behavior."  Id. ¶¶ 10–11.  Despite these difficulties, Salgado-Martinez earned his high school diploma in 2013.  See id. ¶ 11; see also Falk Decl. Ex. D (High School Diploma) (dkt. 34-4).

Shortly before his high school graduation, Salgado-Martinez applied for Deferred Action for Childhood Arrivals (DACA) and Employment Authorization status, which was approved on October 25, 2012, then extended through October 18, 2016.  MTD at 3; see generally DACA Application; Falk Decl. Ex. B (Employment Authorization Application) (dkt. 34-2); Ex. C (ICE Approvals for DACA Status and Work Authorization) (dkt. 34-3).  Salgado-Martinez began taking courses at Chabot College immediately following high school, in the fall of 2013.  See Salgado-Martinez Decl. ¶ 13; see also Opp'n Ex. I (School Records) (dkt. 42-1) at 33 of 34.  He also worked part-time in restaurants and at a Walgreens.  Salgado-Martinez Decl. ¶ 13.  Salgado-Martinez planned to join the Marines, and started studying for the Armed Services Vocational Aptitude Battery test in 2014.  See MTD at 3; see also id. ¶ 14.

**B.  Victim of Attempted Murder**

On February 10, 2015, Salgado-Martinez became a victim of attempted murder.  Lawrence Decl. ¶ 4(f); see generally Falk Decl. Ex. Q (2/10/15 Police Report) (dkt. 34-17).  On that day, law enforcement officers in Hayward, California found Salgado-Martinez and a friend, Jesus Meza, "lying with their backs on the ground, and profusely bleeding."  2/10/15 Police Report at 11 of 76.

United States District Court
Northern District of California

2

After viewing surveillance video, the officers discovered that two males, later identified as Benjamin Cisneros and Noel Garcia, approached Salgado-Martinez and Meza, who were standing on the sidewalk. Id. at 60 of 76; see also MTD at 3–4. At that time, their female accomplice, Angela Sardell, attempted to run Salgado-Martinez over with her car, coming "within about one foot of striking the victims." 2/10/15 Police Report at 60 of 76; see also MTD at 4. Cisneros then chased Salgado-Martinez as he attempted to run away, stabbing him multiple times. 2/10/15 Police Report at 60–61 of 76; see also MTD at 4. One of the officers indicated that, at one point, Cisneros

> attempted to stab Salgado in his upper left chest, but Salgado was able to block the knife from entering his chest with his left hand. As a result, the blade of the knife penetrated through Salgado's entire hand. If the blade of the knife would have penetrated Salgado's chest, it could have entered his heart, lungs or other vital organs, which could have likely been a fatal injury.

2/10/15 Police Report at 63 of 76.

Salgado-Martinez suffered severe injuries. See Lawrence Decl. ¶ 4(f); see also Salgado-Martinez Decl. ¶ 15. He required over a dozen stitches for his hand and leg and surgery to sew the severed tendons in his hand back together. Lawrence Decl. ¶ 4(f). Salgado-Martinez was hospitalized for four days. Id.; see also Salgado-Martinez Decl. ¶ 15. He underwent "significant physical therapy," but still has not regained complete mobility in his hand. See Lawrence Decl. ¶ 4(f); see also Salgado-Martinez Decl. ¶ 15. Salgado-Martinez "was told after the injury that [he] could not apply to the Marines because [he] now had a disability." Salgado-Martinez Decl. ¶ 15.

The attack appears to have been motivated by gang ties. See 2/10/15 Police Report at 60, 63 of 76; see also Opp'n (dkt. 42) at 2. The investigating officer concluded that "Benjamin Cisneros, Noel Garcia and Angela Sardell; all North Side Hayward criminal street gang members/associates, attacked Jesus Meza, a documented Little Town Sureño criminal street gang member and Joseth Salgado, a documented Varrio South Garden [S]ureño criminal street gang member." 2/10/15 Police Report at 63 of 76.

Salgado-Martinez provided a statement to law enforcement officers and cooperated in the

investigation by attempting to identify the suspects through a photographic line-up.  See id. at 41–42, 48 of 76.  The perpetrators were prosecuted.  Lawrence Decl. ¶ 4(g).

### C.      Convicted of Robbery

On February 8, 2016, Salgado-Martinez and three friends, including Meza, were arrested.  MTD at 5; see also Opp'n Ex. A (2/8/16 Police Report) (dkt. 42-1) at 5–6 of 8.   The police report indicates that, earlier that day, "[t]hree [suspects] attacked two [victims] with fists and a baseball bat."  2/8/16 Police Report at 3 of 8.  One of the victims suffered two broken arms requiring surgery.  Id.  A suspect not matching Salgado-Martinez's description was seen on surveillance video leaving the scene and "carrying a pair of black shoes in his hand."  Id. at 6 of 8.  However, a suspect matching Salgado-Martinez's description was seen on the video leaving the scene.  Id.  This attack also appears to have been motivated by gang ties.  See id. at 4 of 8 (noting that the victims were members of the Norteño gang and recognized the suspects as "Southerners.").

On July 7, 2017, Salgado-Martinez pleaded guilty in Alameda County Superior Court to one count of robbery in violation of California Penal Code § 211.  Opp'n at 2; see also MTD at 5.  He was sentenced to two years in prison.  MTD at 5; see also Salgado-Martinez Decl. ¶ 16.  Meza was sentenced to nine years in prison for both robbery and assault.  MTD at 5.  Prior to this conviction, Salgado-Martinez had only received an infraction for violating California Penal Code § 415 (Disturbing the Peace), for which he paid a fine in January 2015.  Lawrence Decl. ¶ 4(e).

### D.      Immigration Proceedings

ICE located Salgado-Martinez at Folsom State Prison and placed a detainer on him in February 2017.  MTD at 5; see also Salgado-Martinez Decl. ¶ 18.  After an in-custody interview in November 2017, ICE determined that Salgado-Martinez was suitable for deportation by means of administrative removal.  MTD at 5.  On December 19, 2017, ICE issued a Warrant of Removal, a Final Administrative Removal Order, and a Notice of Intent to Issue a Final Removal Order.  Id.; see generally Falk Decl. Ex. E (Warrant of Removal) (dkt. 34-5); Ex. F (Final Administrative Removal Order) (dkt. 34-6); Ex. 6 (Notice of Intent to Issue a Final Administrative Removal Order) (dkt. 34-7).

On January 3, 2018,[1] ICE transferred Salgado-Martinez from Folsom Prison to an ICE processing facility in Sacramento, California.  See MTD at 5; see also Notice of Intent to Issue a Final Administrative Removal Order at 3 of 3.  There, Salgado-Martinez refused to sign the Certificate of Service on the back of the Notice of Intent and accept deportation, instead requesting withholding of removal to Mexico under 8 U.S.C. § 1231(b)(3) and the Convention Against Torture based upon his fear of returning to Mexico.  Opp'n at 3; see also Notice of Intent to Issue a Final Administrative Removal Order at 3 of 3; MTD at 5.  At that time, Salgado-Martinez received and initialed a list of pro bono legal service providers.  Opp'n at 3; see also Opp'n Ex. C (Legal Service Providers) (dkt. 42-1) at 1.

Salgado-Martinez was allotted one free three-minute phone call to his parents on that day; during that call, he asked for their help finding an attorney.  MTD at 5; see also Falk Decl. Ex. H (Detainee Telephone Call Record) (dkt. 34-8); Salgado-Martinez Decl. ¶ 19.  Salgado-Martinez was then transferred to a contract ICE detention facility in Elk Grove, California: the Rio Cosumnes Correction Center ("RCCC").  MTD at 6.

### 1.     The ACLU Suit Against RCCC

Unbeknownst to Salgado-Martinez at the time, RCCC had been the subject of a suit brought by the ACLU in 2013, Lyon et. al v. ICE, 3:13-cv-05878-EMC.  See MTD at 6; see generally Falk Decl. Ex. N (Lyon Complaint) (dkt. 34-14).  In the lawsuit, the ACLU alleged that RCCC, along with other ICE detention facilities, violated detainees' Fifth Amendment rights by denying and restricting their ability to make phone calls to locate and communicate with counsel and to gather information and obtain evidence to support their cases and applications for immigration benefits.  MTD at 6; see also Lyon Complaint at 23–24.

After three years of litigation, ICE and the ACLU entered into a Settlement Agreement, which Judge Chen approved on July 1, 2016.  MTD at 7; see generally Falk Decl. Ex. O (Settlement Agreement) (dkt. 34-15).  Pursuant to the agreement, RCCC was required to: (1)

---

[1] The Motion to Dismiss lists the year as 2020, see MTD at 5, but this appears to be an error; the correct date is listed on the Notice of Intent to Issue a Final Administrative Removal Order.

United States District Court
Northern District of California

enable detainees to make free calls to government agencies and identified attorneys performing pro bono services without requiring positive acceptance (a live person answering) or recording and monitoring, (2) enable detainees to make paid calls to attorneys not identified as performing pro bono services without requiring positive acceptance or recording and monitoring, (3) provide accommodations to indigent detainees by allowing them extra access to phone rooms (where they could make free calls) or providing phone credit, (4) inform detainees that they should contact an ICE officer if they had difficulty making a legal call, (5) post instructions sheets in English and Spanish explaining how to use the phones, and (6) show a video to detainees within one week of arrival at the facility explaining phone access options.  MTD at 7–8; <u>see also</u> Settlement Agreement at 6–13.  ICE was required to implement the telephone access provisions at RCCC by November 17, 2017.  MTD at 8; <u>see also</u> Falk. Decl. Ex. P (ACLU Advisory) (dkt. 34-16) at 1.

Salgado-Martinez arrived at RCCC in January 2018, less than two months after the deadline for implementation.  MTD at 8.  During his first three weeks at the facility, Salgado-Martinez tried to use the phone system at RCCC to access an attorney.  MTD at 8.  However, "[b]ecause that phone system was overly confusing and difficult to use . . . Mr. Salgado-Martinez was unable to make contact with an attorney."  <u>Id.</u>  Contrary to the settlement's requirements, Salgado-Martinez never saw a video about phone access, saw posted instructions, or was told that a staff member was available as a legal call facilitator.  <u>Id.</u>; <u>see also</u> Salgado-Martinez Decl. ¶ 21.  No staff member informed him that he could make free legal calls on an unrestricted phone or receive free phone minutes if he was indigent.  MTD at 8; <u>see also</u> Salgado-Martinez Decl. ¶ 27.

Salgado-Martinez states that he could not communicate with his parents about their efforts to find an attorney and was unable to use the pro bono attorney list or numbers for other attorneys he received from fellow detainees due to difficulties with the phone system.  <u>See</u> MTD at 9; <u>see also</u> Salgado-Martinez Decl. ¶¶ 20–21, 23–24.  Although he was able to make non-legal calls to a childhood friend, he asserts that, after dialing the sequence of numbers required to access a free legal call, he would hear only "angry beeping" or a recording that "your call cannot be completed as dialed."  MTD at 9; <u>see also</u> Salgado-Martinez Decl. ¶ 24–25.  An ACLU Advisory from May 2018 noted that the ACLU was aware of detainees at RCCC who had difficulty navigating the

facility's speed dial system.  See ACLU Advisory at 5.

### 2.      Reasonable Fear Interview

Because Salgado-Martinez expressed a fear of retuning to Mexico, ICE referred his case to an asylum officer for a reasonable fear interview.  See Opp'n at 3; see also Opp'n Ex. D (Notice of Reasonable Fear Interview) (dkt. 42-1).  Salgado-Martinez's first reasonable fear interview was held on January 12, 2018.  See MTD at 9; see also Opp'n at 3.  During that interview, he requested a continuance in order to allow for consultation with an attorney.  MTD at 9; see also Opp'n at 3; Falk Decl. Ex. K (Tolling Notes) (dkt. 34-11).  ICE rescheduled the interview for January 24, 2018 and Salgado-Martinez again requested a continuance to obtain legal representation.  MTD at 10; see also Opp'n at 3; Tolling Notes.

On January 31, 2018, Salgado-Martinez asserts that ICE agents informed him that he either had to go forward without an attorney on that day or abandon the claim.  MTD at 10; see also Salgado-Martinez Decl. ¶ 28.  According to the asylum officer's notes, Salgado-Martinez told the officer that he and his family did not "have the money to pay" an attorney.  Falk Decl. Ex. L (Interview Notes) (dkt. 34-12) at 3 of 8.  Salgado-Martinez also said that he "didn't try to call anyone from the [pro bono] list" because "[i]t didn't occur to" him and he did not "know if there [was] anything they [could] do for" him.  Id. at 3–4 of 8.  The officer asked him if he wanted to continue the interview without an attorney present and he said he did.  Id. at 4 of 8.

When asked how he was treated in detention, Salgado-Martinez responded, "[f]airly."  Id. He disclosed problems with sanitation and privacy at the facility but did not mention issues with the phones.  See id.  When asked whether he experienced other problems, he responded that he had not.  Id.  During the interview, Salgado-Martinez admitted that he was a Sureño gang member from the time he was 14 years old until he went to prison.  Id. at 7 of 8.

Later in the interview, Salgado-Martinez withdrew from the reasonable fear process, telling the asylum officer that he "probably [couldn't] win."  Interview Notes at 7–8 of 8; see also Salgado-Martinez Decl. ¶ 28.

United States District Court
Northern District of California

1

**E.      Removal and Reentry**

2        A week later, on February 9, 2018, Salgado-Martinez was bussed to the border and

3   deported to Tijuana by foot.  MTD at 10.  He "knew no one in Mexico" and slept on the sidewalk

4   and "was often harassed by the police."  Salgado-Martinez Decl. ¶ 31.  He stayed in a homeless

5   shelter and eventually re-crossed the border into the United States.  MTD at 10; see also id.

6        From April 2018 to May 2019, Salgado-Martinez worked "under the table" in Hayward for

7   a moving company and lived with his family.  Salgado-Martinez Decl. ¶ 32.  On May 24, 2019, he

8   was arrested in Alameda County after the California Department of Adult Parole Operations

9   received an anonymous tip that he had reentered the country in violation of his state parole

10  conditions.  MTD at 11; see also Opp'n at 4.  On August 14, 2019, the government filed a criminal

11  complaint charging Salgado-Martinez with illegal reentry.  See Compl.  Days later, he received

12  bail and has been under U.S. Pretrial Services and California State Parole supervision since that

13  time.  MTD at 11.  He works in construction, helps his parents with his younger siblings, and

14  contributes to the family's bills.  See id.; see also Salgado-Martinez Decl. ¶ 35; Lawrence Decl. ¶

15  4(k).  He is also expecting his first child with his girlfriend, who is a U.S. citizen.  Lawrence Decl.

16  ¶ 4(k).

17       Since receiving bail, Salgado-Martinez has met with immigration attorneys and learned

18  about the U-visa, a special visa for victims of violent crimes in the United States.  MTD at 11; see

19  also Salgado-Martinez Decl. ¶ 36.  In February 2020, Salgado-Martinez obtained a U-visa

20  Certification, which is an affidavit from law enforcement attesting that he meets the basic U-visa

21  requirements.  MTD at 11–12; see also Falk Decl. Ex. R (U-Visa Certification) (dkt. 34-18).

22       Salgado-Martinez now brings a motion to dismiss his indictment, arguing that his

23  administrative removal cannot constitute the prior lawful deportation order necessary for the

24  government to establish the deportation element of the offense because the defective phone system

25  at RCCC violated his due process rights and he suffered prejudice as a result.  See MTD at 1.

26  **II.      LEGAL STANDARD**

27       A defendant may move to dismiss an indictment on the ground that the indictment "fail[s]

28

8

1    to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).  In considering a motion to dismiss an

2    indictment, a court must "analyz[e] whether a cognizable offense has been charged." United

3    States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002).  Courts may grant a pretrial motion to dismiss

4    an indictment when it seeks to resolve questions of law, not fact.  United States v. Schulman, 817

5    F.2d 1355, 1358 (9th Cir. 1987).

6        In order to convict a defendant of violating 8 U.S.C. § 1326, the government must prove

7    the following three elements beyond a reasonable doubt: (1) the defendant is a noncitizen; (2) the

8    defendant was previously deported from the United States; and (3) the defendant was found in the

9    United States without the consent of the Attorney General. 8 U.S.C. § 1326(a).  "Because the

10   underlying removal order serves as a predicate element of an illegal reentry offense under § 1326,

11   a defendant charged with that offense may collaterally attack the removal order under the due

12   process clause." United States v. Pallares-Galan, 359 F.3d 1088, 1095 (9th Cir. 2004) (citing

13   United States v. Mendoza-Lopez, 481 U.S. 828, 837–38 (1987)).  The right to collaterally attack a

14   removal order "is codified at 8 U.S.C. § 1326(d)." United States v. Cisneros-Rodriguez, 813 F.3d

15   748, 755 (9th Cir. 2015).

16       To prevail in a collateral attack on a prior deportation, the defendant must show "that—(1)

17   the [defendant] exhausted any administrative remedies that may have been available to seek relief

18   against the order; (2) the deportation proceedings at which the order was issued improperly

19   deprived the [defendant] of the opportunity for judicial review; and (3) the entry of the order was

20   fundamentally unfair." 8 U.S.C. § 1326(d).  The defendant bears the burden of proving each

21   element.  See United States v. Gonzalez-Villalobos, 724 F.3d 1125, 1129 (9th Cir. 2013).

## III.    DISCUSSION

23       Salgado-Martinez contends that (A) he meets the third prong because the entry of his

24   removal order was fundamentally unfair and (B) he meets the first and second prongs because he

25   was administratively removed after being denied his due process right to counsel and was thus

26   denied the opportunity for meaningful judicial review and is excused from exhaustion of

27   administrative remedies.  See MTD at 13, 20.

United States District Court
Northern District of California

1    The Court concludes below that Salgado-Martinez has established each of the three prongs

2    of 8 U.S.C. § 1326(d).

3         **A.     Fundamental Unfairness**

4         An order satisfies the third prong and is "fundamentally unfair" when "(1) [a defendant's]

5    due process rights were violated by defects in his underlying deportation proceeding, and (2) he

6    suffered prejudice as a result of the defects."  United States v. Gomez, 757 F.3d 885, 892 (9th Cir.

7    2014) (quoting United States v. Ubaldo–Figueroa, 364 F.3d 1042, 1048 (9th Cir. 2004)).  The

8    third prong is dispositive.  See Cisneros-Rodriguez, 813 F.3d at 756 (holding that "[i]f

9    [defendant's] final order of removal was entered in violation of her due process rights, and if she

10   suffered prejudice as a result, she is deemed to have 'exhausted all administrative remedies

11   available to [her]' and to have been 'deprived . . . of the opportunity for judicial review.'") (citing

12   Ubaldo-Figueroa, 364 F.3d at 1048).  Therefore, the Court addresses the third prong first.

13        **1.     Due Process Violation**

14        The government does not dispute that a person in immigration proceedings is entitled to

15   "the privilege of being represented (at no expense to the government) by such counsel, authorized

16   to practice in such proceedings, as the [noncitizen] shall choose."  See 8 U.S.C. § 1228(b)(4)(B);

17   see also Opp'n at 7.  The Ninth Circuit held that the right to counsel at an immigration hearing is a

18   constitutional due process right.  See Ram v. Mukasey, 529 F.3d 1238, 1241 (9th Cir. 2008)

19   ("Although there is no Sixth Amendment right to counsel in an immigration hearing, Congress has

20   recognized it among the rights stemming from the Fifth Amendment guarantee of due process that

21   adhere to individuals that are the subject of removal proceedings.") (citing Tawadrus v. Ashcroft,

22   364 F.3d 1099, 1103 (9th Cir. 2004)).

23        Salgado-Martinez asserts that an ICE detainee also has the parallel "due process and

24   statutory right to adequately present his or her case."  MTD at 14 (emphasis in original) (citing

25   Colmenar v. I.N.S., 210 F.3d 967, 971 (9th Cir. 2000)).  This is supported in the case law.  The

26   Ninth Circuit has held that "[t]he Fifth Amendment guarantees due process in deportation

27   proceedings.  As a result, [a noncitizen] who faces deportation is entitled to a full and fair hearing

28

10

of his claims and a reasonable opportunity to present evidence on his behalf." <u>Colmenar</u>, 210 F.3d at 971 (citations omitted). The Ninth Circuit has also recognized the complex nature of immigration law and the resulting difficulties pro se detainees face. <u>See</u> <u>Biwot v. Gonzales</u>, 403 F.3d 1094, 1098 (9th Cir. 2005) ("The high stakes of a removal proceeding and the maze of immigration rules and regulations make evident the necessity of the right to counsel. The proliferation of immigration laws and regulations has aptly been called a labyrinth that only a lawyer could navigate.") (citing <u>Castro-O'Ryan v. I.N.S.</u>, 847 F.2d 1307, 1312 (9th Cir. 1987)). Therefore, Salgado-Martinez argues that "[r]ealistically, ICE detainees can only present defenses to deportation with the assistance of an attorney." MTD at 14.

Salgado-Martinez contends that the deficient phone access conditions at RCCC resulted in violations of both his right to counsel and his right to adequately present evidence on his own behalf. <u>See</u> <u>id.</u> Salgado-Martinez asserts that, contrary to the settlement's requirements, he never saw a video about phone access, saw posted instructions, or was told that a staff member was available as a legal call facilitator. <u>Id.</u> at 8; <u>see also</u> Salgado-Martinez Decl. ¶ 21; Settlement Agreement at 13. No staff member informed him that he could make free legal calls on an unrestricted phone or receive free phone minutes if he was indigent. MTD at 8; <u>see also</u> Salgado-Martinez Decl. ¶ 27; Settlement Agreement at 12. When Salgado-Martinez attempted to make a free legal call, he would hear only "angry beeping" or a recording that "your call cannot be completed as dialed." MTD at 9; <u>see also</u> Salgado-Martinez Decl. ¶ 24–25.

The government does not actually dispute that ICE failed to comply with its obligations under the Settlement Agreement. <u>See</u> Reply ISO MTD (dkt. 50) at 8. It does not point to any evidence contradicting Salgado-Martinez's contentions regarding the deficient phone conditions at RCCC. The government argued at the motion hearing, however, that it is Salgado-Martinez's burden to show that the phone system was not working, and that he may not shift the burden to the government to demonstrate that it was. The Court agreed, but observed that Salgado-Martinez had adduced unrebutted evidence that the phone system was not working. The government ultimately conceded that there was "no affirmative rebuttal" of Salgado-Martinez's evidence, but argued essentially that his evidence is insufficient, largely because he never raised concerns about the

phone system while in custody, even when asked about his time at RCCC.  See also id. at 8–9; see also Opp'n at 8–9.  As defense counsel noted at the hearing, however, Salgado-Martinez was not asked about the phone system.  He was not asked about the conditions at RCCC.  The question that prompted Salgado-Martinez's response about sanitation and privacy was "How have you been treated in detention?"  See Falk Decl. Ex. L at 4 of 8.[2]  The context of the question was a reasonable fear interview in which Salgado-Martinez had been told that he had to participate without counsel, and in which he was trying to win his questioner over.  His failure to raise the phone issue in that context does not undermine his assertion of that issue now.  In addition, Salgado-Martinez's original attorney states that Salgado-Martinez disclosed the telephone deficiencies during his intake interview, and it was only after this meeting that the attorney learned of the ACLU litigation in the matter.  See Rizk Decl. (dkt. 37) ¶¶ 3, 5.  The government does raise issues related to Salgado-Martinez's waiver of counsel and due diligence to locate counsel, see Opp'n at 7–9, discussed below.  But in the absence of contrary evidence, the Court accepts Salgado-Martinez's representations about the phone deficiencies as true.

Courts ordinarily apply the Mathews v. Eldridge, 424 U.S. 319 (1976), balancing test to determine the constitutional sufficiency of procedures in immigration cases.  See Landon v. Plasencia, 459 U.S. 21, 34 (1982) (applying the Mathews test to an exclusion proceeding).  In evaluating procedures, courts consider "the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures."  Id. (citing Mathews, 424 U.S. at 334–35).  However, as Salgado-Martinez asserts, "ICE has already conceded that it would make the changes in procedures documented in the Settlement Agreement."  MTD at 15–16 n.6; see also Settlement Agreement at 6–13.  Accordingly, there is nothing to balance because there is no valid government interest in failing to comply with the Settlement Agreement.  See MTD at 15–16 n.6.

---

[2] The sequence of questions and responses is as follows: "Q. How have you been treated in detention?  A. Fairly.  Q. What do you mean by that?  A. In a way it's good and a way it's bad.  Q. How bad?  A. Place is not sanitized enough and we do not get enough privacy compared to cell living."  Id.

1    In order "[t]o infuse the critical right to counsel with meaning," the Ninth Circuit has held

2    that immigration judges "must provide [noncitizens] with reasonable time to locate counsel and

3    permit counsel to prepare for the hearing." Biwot, 403 F.3d at 1098–99 (citations omitted). As

4    Salgado-Martinez posits, "[i]t logically follows that in addition to 'reasonable time' ICE must also

5    provide 'reasonable access' to the outside world to 'locate counsel.'" MTD at 16. If reasonable

6    time is necessary to give meaning to the right to counsel, reasonable access to counsel must also

7    be necessary to give meaning to the otherwise useless time. The Ninth Circuit has held that

8    deprivation of counsel in immigration proceedings constitutes a due process violation. See, e.g.,

9    Montes-Lopez v. Holder, 694 F.3d 1085, 1089 (9th Cir. 2012) ("We have recognized that denial

10   of counsel or ineffective assistance of counsel in an immigration proceeding may violate the Fifth

11   Amendment." (citations omitted)); Rios-Berrios v. I.N.S., 776 F.2d 859, 862–63 (9th Cir. 1985)

12   (holding that an immigration judge's unreasonable failure to grant a continuance to a detainee for

13   the purpose of locating counsel was a due process violation). The Ninth Circuit has also held that

14   "denial of counsel in an immigration proceeding is serious enough to be reversible without a

15   showing of error . . . ." Montes-Lopez, 694 F.3d at 1093.

16   Salgado-Martinez asserts (and the government does not dispute) that "[a]dequate telephone

17   access is simply the only way a detained immigrant can hire an attorney." See MTD at 16. The

18   government does not contradict Salgado-Martinez's argument that the deficient phone conditions

19   at RCCC "constitute a due process violation for 8 U.S.C. § 1326 purposes." See Reply ISO MTD

20   at 12. Additionally, courts have recognized the importance of telephone access in the immigration

21   context. See, e.g., Orantes-Hernandez v. Meese, 685 F. Supp. 1488, 1512 (C.D. Cal. 1988), aff'd

22   sub nom. Orantes-Hernandez v. Thornburgh, 919 F.2d 549 (9th Cir. 1990) (requiring immigration

23   authorities to provide access to telephones during processing of Salvadoran detainees); Perez-

24   Funez v. Dist. Dir., I.N.S., 619 F. Supp. 656, 665 n.19 (C.D. Cal. 1985) (holding that

25   unaccompanied minors seeking entry in to the United States should "be given the fullest

26   opportunity to obtain the advice necessary to make an informed decision, and not merely the right

27   to make and complete a single phone call."). In his order denying ICE's motion for summary

28   judgment on plaintiffs' procedural due process claims in Lyon, Judge Chen found that "the nature

United States District Court
Northern District of California

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

and breadth of the systemic phone restrictions and their potential impact upon detainees' ability to communicate with counsel, relatives, government agencies, etc., are sufficient to establish a real risk . . . that the restrictions 'may' or 'potentially' affect the outcome of removal proceedings . . . ." Lyon v. U.S. Immigration & Customs Enf't, 171 F. Supp. 3d 961, 983 (N.D. Cal. 2016) (citations omitted).

Despite the undisputed deficiency of RCCC's phone system and the necessity of an operational/accessible phone system for a detainee to locate counsel, the government argues that (a) Salgado-Martinez knowingly and voluntarily waived his right to counsel and (b) he did not act with due diligence to find a lawyer. See Opp'n at 7–9. For the reasons set forth below, these arguments fail.

### a.      Waiver of Counsel

For a waiver of counsel to be valid, an immigration agent must: "(1) inquire specifically as to whether [the detainee] wishes to continue without a lawyer; and (2) receive a knowing and voluntary affirmative response. Failure to obtain such a waiver is an effective denial of the right to counsel . . . ." Tawadrus, 364 F.3d at 1103 (citations omitted). "Improperly obtaining such a waiver constitutes a due process violation." Cisneros-Rodriguez, 813 F.3d at 756 (citations omitted). It is undisputed that, during the reasonable fear interview on January 31, 2018, the asylum officer asked Salgado-Martinez if he wanted to continue his interview without an attorney present, thus satisfying the first condition of a valid waiver. See Interview Notes at 4 of 8.

While it is also undisputed that Salgado-Martinez responded in the affirmative, see id., his response likely cannot be fairly characterized as voluntary. The government bears the burden of establishing that the waiver was knowing and voluntary by clear and convincing evidence. See Pallares-Galan, 359 F.3d at 1097 (finding that the government had not established "intentional relinquishment" of the right to appeal). The court should "'indulge every reasonable presumption against waiver'" and should "not 'presume acquiescence in the loss of fundamental rights . . . , especially where an uncounseled individual purportedly waived' her right to counsel." Cisneros-Rodriguez, 813 F.3d at 756 (emphasis in original) (quoting Gomez, 757 F.3d at 894). In support

United States District Court
Northern District of California

1   of its burden, the government cites the Notice of Intent to Issue a Final Administrative Removal

2   Order, which informed Salgado-Martinez of his right to counsel, and Salgado-Martinez's two

3   granted requests to postpone his reasonable fear interview so that he could have additional time to

4   locate an attorney.  See Opp'n at 7; see also Notice of Intent to Issue a Final Administrative

5   Removal Order; Tolling Notes.  While these documents establish that Salgado-Martinez was

6   aware of his right to counsel and may have waived it knowingly, they do not establish that he

7   voluntarily waived his right to counsel at the final interview.

8          The government asserts that "Salgado-Martinez made a decision to proceed without an

9   attorney voluntarily, without undue pressure or influence," Opp'n at 8, which stands in stark

10  contrast to the "pressure from the ICE agents" Salgado-Martinez asserts that he felt "on that day,

11  as [he] was told [he] had run out of time to find an attorney."  Salgado-Martinez Decl. ¶ 28.

12  According to Salgado-Martinez, he "was told [he] either had to go forward without an attorney . . .

13  or pull [his] fear request back and accept deportation."  Id.  Salgado-Martinez contends that he

14  "had been given two continuances already," and that "[n]o one told [him he] could get another

15  continuance."  Second Salgado-Martinez Decl. (dkt. 48) ¶ 4.  The government's assertion is also

16  undermined by ICE's own statement to Salgado-Martinez during the January 24th meeting that he

17  "must be ready to go forward by early next week.  If you do not have an attorney by early next

18  week, you will need to go forward."  Falk Decl. Ex. J (Asylum Officer Meeting Notes) (dkt. 34-

19  10) at 2 of 11.

20         While, as the government asserts, the Ninth Circuit has not found an invalid waiver of the

21  right to counsel under similar circumstances, see Opp'n at 8, neither party cites a case in which the

22  Circuit assessed the question given a lack of access to an attorney.  Given the presumption against

23  waiver of right to counsel by uncounseled individuals, see Cisneros-Rodriguez, 813 F.3d at 756

24  (quoting Gomez, 757 F.3d at 894), Salgado-Martinez could not have voluntarily waived a right

25  that he was unable to access.

26         Accordingly, the Court concludes that the government has not provided clear and

27  convincing evidence that Salgado-Martinez voluntarily waived his right to counsel.

28

####     b.     Due Diligence

The government next asserts that Salgado-Martinez did not act with due diligence to find an attorney.  Opp'n at 8.  While Salgado-Martinez's original declaration "did not provide any information about how many lawyers he called or how often he called them," see id., that is hardly dispositive of his claim that his due process rights were violated.  Salgado-Martinez contends that he did not provide specifics in his first declaration because he did "not remember every specific call" and its details.  Second Salgado-Martinez Decl. ¶ 3.  Further, his statement during the interview that he did not try to contact the attorneys on ICE's free legal services list because he did not "know if there [was] anything they [could] do for [him]," see Interview Notes at 3–4 of 8, does not negate the efforts he attests that he made to contact other attorneys and his parents regarding legal representation.  See Salgado-Martinez Decl. ¶¶ 20, 23–24, 26.  He did not ask for a further continuance because he "was told [he] had run out of time."  See id. ¶ 28.  That Salgado-Martinez did not raise with the asylum officer his difficulties with the phone system, see Interview Notes at 4 of 8, nor send any "kites"[3] to ICE for assistance, does not disprove Salgado-Martinez's assertion that he nonetheless attempted to access an attorney.  Further, the government has not cited any case holding that a detainee must contemporaneously report a potential due process violation, or find himself barred from asserting the violation later.

Therefore, the Court concludes that the defective phone system at RCCC led to a violation of Salgado-Martinez's due process right to counsel and his due process right to present evidence on his own behalf.

####     2.     Prejudice as a Result of Defects

To establish fundamental unfairness and satisfy the third prong of 8 U.S.C. § 1326(d), Salgado-Martinez must also show that he suffered prejudice as a result of the defects in his underlying deportation proceeding.  See Gomez, 757 F.3d at 892 (quoting Ubaldo–Figueroa, 364 F.3d at 1048).  To establish prejudice, a defendant "must only show that he had a 'plausible'

---

[3] A kite is a message sent to ICE personnel regarding detainees' questions, requests, and grievances.  See Opp'n at 4.  Salgado-Martinez sent a single kite at RCCC, requesting access to his property on January 4, 2018.  Id.; see also Opp'n Ex. H.

16

1   ground for relief from deportation." Ubaldo-Figueroa, 364 F.3d at 1050 (emphasis added)

2   (citations omitted). Salgado-Martinez need not show that he actually would have been granted

3   relief absent the constitutional violation. See id.; see also Pallares-Galan, 359 F.3d at 1103. Thus,

4   Salgado-Martinez "needs to show that relief was more than 'possible,' but [he] need not show that

5   it was 'probable.'" See Cisneros-Rodriguez, 813 F.3d at 761.

6          Salgado-Martinez does not contend that he would have been successful during the

7   reasonable fear interview process with the assistance of counsel; instead, he asserts that he would

8   have applied for and plausibly received a U-visa. See MTD at 18. Congress created the U-visa

9   program in the Victims of Trafficking and Violence Prevention Act of 2000. See id.; see also

10  Opp'n at 9; Lawrence Decl. ¶ 5(a). To obtain a U-visa, a noncitizen must: (1) have suffered

11  substantial physical or mental abuse because he or she was a victim of certain crimes; (2) possess

12  information concerning that crime; (3) have been, currently be, or be likely to be helpful in the

13  investigation or prosecution of that crime; (4) have certification from law enforcement certifying

14  his or her helpfulness in the investigation or prosecution of the crime; and (5) have been the victim

15  of a crime that violated the laws of or occurred in the United States. See 8 U.S.C. §

16  1101(a)(15)(U)(i); see also Cisneros-Rodriguez, 813 F.3d at 759 (citing 8 C.F.R. §

17  214.14(c)(2)(i)). The list of qualifying crimes includes murder, felonious assault, or attempt of

18  either. 8 U.S.C. § 1101(a)(15)(U)(iii).

19         An applicant must also be admissible to the United States to obtain a U-visa. Lawrence

20  Decl. ¶ 5(g); see also Opp'n at 10. Grounds of inadmissibility include conviction of crimes

21  "involving moral turpitude" and entering the United States without inspection. See 8 U.S.C. §§

22  1182(a)(2)(A)(i)(I), (a)(6)(A)(i). However, U-visa applicants may receive a waiver of grounds of

23  inadmissibility under either 8 U.S.C. § 1182 (d)(14) or 8 U.S.C. § 1182(d)(3). 8 C.F.R. §

24  212.17(b)(1).

25         It is undisputed that Salgado-Martinez meets the preliminary requirements to obtain a U-

26  visa based on the February 2015 incident in Hayward in which he was a victim of attempted

27  murder. See MTD at 18; see also Opp'n at 11; 2/10/15 Police Report at 1, 60–61, 63 of 76;

28  Lawrence Decl. ¶ 5(o). Attempted murder is a qualifying crime for a U-visa, 8 U.S.C. §

United States District Court
Northern District of California

17

1101(a)(15)(U)(iii), and Salgado-Martinez suffered significant physical harm as a result of the attack, <u>see</u> Lawrence Decl. ¶ 4(f); <u>see also</u> Salgado-Martinez Decl. ¶ 15.  Salgado-Martinez was helpful in the police investigation of the crime, <u>see</u> 2/10/15 Police Report at 41–42, 48 of 76, and has already obtained the required certification form from the Alameda County Sheriff's Office verifying his helpfulness in the investigation, <u>see generally</u> U-Visa Certification.  That the investigation is already closed is immaterial, because the statute provides relief for a victim who "has been helpful."  <u>See</u> 8 U.S.C. § 1101(a)(15)(U)(i)(III); <u>see also</u> Lawrence Decl. ¶ 5(e).

Thus, the parties' dispute centers on the inadmissibility grounds that apply to Salgado-Martinez and <u>whether it is plausible that he would have received a waiver</u>.  <u>See</u> <u>Ubaldo-Figueroa</u>, 364 F.3d at 1050.  At the time of his deportation, Salgado-Martinez required a waiver for both his entry to the United States without inspection as a child, and his 2017 robbery conviction, which is considered a crime "involving moral turpitude."  <u>See</u> 8 U.S.C. §§ 1182(a)(2)(A)(i)(I), (6)(A)(i); <u>see also</u> Opp'n at 11; Lawrence Decl. ¶¶ 5(s)–(t).  Helen Lawrence, Salgado-Martinez's immigration attorney,[4] asserts (and the government does not dispute) that waivers for entry without inspection "are routinely requested and granted."  Lawrence Decl. ¶ 5(w).  She further attests that she has "no doubt that Mr. Salgado would have been granted a waiver" on that ground. <u>Id.</u>

It is a closer question whether it is plausible that Salgado-Martinez would have received a waiver for his robbery conviction.  Salgado-Martinez does not argue that he would have received a waiver under 8 U.S.C. § 1182(d)(14), which involves the public or national interest and is specific to U-visa applicants.  <u>See</u> Reply ISO MTD at 5–6.  Instead, Salgado-Martinez asserts that he would have received a waiver under 8 U.S.C. § 1182(d)(3)(A), a general waiver provision, which he refers to as its corresponding provision in the Immigration and Nationality Act, INA § 212(d)(3)(A).[5]  <u>See</u> <u>id.</u>  The general waiver provision is applicable to U-visa applicants under 8

---

[4] The government argues that Ms. Lawrence's opinion deserves little weight.  Opp'n at 13–14.  However, because Ms. Lawrence addressed most of the government's asserted flaws in her Reply Declaration (dkt. 45), the Court concludes that her opinion is relevant.

[5] The government seems to conflate the two waiver provisions in its briefing.  <u>See</u> Reply ISO MTD at 5–6; <u>see also</u> Opp'n at 11–12 (citing 8 U.S.C. § 1182(d)(14)).  Because Salgado-Martinez does not contend that he would have received a public interest waiver, the Court does not address

United States District Court
Northern District of California

1   C.F.R. § 212.17(b)(1).  See id. at 5 (citing 8 C.F.R. § 212.17(b)(1)).  To determine whether it is

2   plausible that United States Citizenship and Immigration Services ("USCIS") would have granted

3   a waiver, the Court must apply factors relevant to the agency's exercise of discretion.  See United

4   States v. Valdez-Novoa, 780 F.3d 906, 917 (9th Cir. 2015).  The factors weigh in favor of

5   Salgado-Martinez.

6          Under the balancing test articulated in Matter of Hranka, the factors USCIS weighs in

7   assessing an application for a waiver under INA § 212(d)(3)(A) include: (1) the risk of harm to

8   society if the person is admitted to the United States; (2) the seriousness of the person's prior

9   immigration and criminal law violations; and (3) the person's reasons for wishing to enter the

10  United States.  16 I. & N. Dec. 491, 492 (BIA 1978).  Matter of Hranka, cited by both the

11  government and Salgado-Martinez, see Opp'n at 10; Reply ISO MTD at 5, also states that "there

12  is no requirement that the applicant's reasons for wishing to enter the United States be

13  'compelling,'" 16 I. & N. Dec. at 491.  The Foreign Affairs Manual states that "[e]ligibility for a

14  [INA § 212 (d)(3)(A)] waiver is not conditioned on having a qualifying family relationship, or the

15  passage of a specific amount of time . . . .  The law does not require that such action be limited to

16  humanitarian or other exceptional cases."  9 FAM 305.4-3(C).  USCIS must also determine

17  whether it should exercise its discretion to grant a waiver.  See USCIS Policy Manual, Volume 9,

18  Part A, Chapter 5, available at https://www.uscis.gov/policy-manual/volume-9-part-a-chapter-5

19  (last accessed Aug. 7, 2020).  Relevant factors include family ties, length of lawful residence in

20  the United States, criminal history, and public safety concerns.  Id.

21         The government asserts that Salgado-Martinez admits to being affiliated with the Sureño

22  gang, see Interview Notes at 7 of 8, which clearly presents a risk of harm to society, see Opp'n at

23  11.  Salgado-Martinez responds that the U-visa process allows an applicant to submit explanations

24  regarding his criminal convictions and past gang membership.  Reply ISO MTD at 6; see also

25  Lawrence Reply Decl. ¶ 4(b).  Salgado-Martinez asserts that, despite his admission to the contrary

26  during his reasonable fear interview, see Interview Notes at 7 of 8, he was not a gang member

27

28  the government's argument that such a waiver would not be in the public interest.  However, the
    Court does discuss the relevant factors relied on by the government in its argument.

even though he had friends who were.  Second Salgado-Martinez Decl. ¶ 7; see also Lawrence Reply Decl. ¶4(b) (echoing this point, explaining that other detainees advised him to claim a fear of return to Mexico based on ex-gang membership).  He states that he would have explained his affiliations in his U-visa application if he had been given a chance to file one in 2018.  Id. Notably, USCIS does not specifically consider gang affiliation as a discretionary factor, and instead assesses "criminal tendencies" based on "an ongoing or continuing criminal record."  See USCIS Policy Manual, Volume 9, Part A, Chapter 5.

Even the government admits that Salgado-Martinez has a "limited" criminal history, despite his gang involvement.  See Opp'n at 11.  His only infraction prior to his robbery conviction was for disturbing the peace, which does not have immigration consequences.  See Lawrence Decl. ¶¶ 4(e), 5(t).  While his robbery conviction is undoubtedly serious, particularly given the victim's injuries, see Opp'n at 11–12, police reports detailing specific facts of a crime are not ordinarily a part of the USCIS evaluation process, according to Ms. Lawrence, particularly because an officer's observations do not necessarily bear on the facts of the conviction.  See Lawrence Reply Decl. ¶ 5(a); see also Reply ISO MTD at 7.  Salgado-Martinez would have also been able to provide his account of the events that led to his conviction in his U-visa application, asserting his "minimal role in the crime."  Lawrence Reply Decl. ¶ 5(b).  He would have pointed out that he was not convicted of a gang enhancement or Great Bodily Injury, and that he received a sentence of less than a quarter of the sentence of the main defendant in the case.  Id.

Salgado-Martinez has several positive equities that weigh in favor of an exercise of discretion by USCIS.  Salgado-Martinez spent the majority of his life in the United States and has no memories of Mexico.  Lawrence Decl. ¶ 5(u).  His parents and siblings, two of whom are U.S. citizens, lived together with him in Hayward, where Salgado-Martinez attended public school and some college.  Id.  Additionally, Salgado-Martinez's assistance in the investigation of his attempted murder weighs in favor of the public interest in the investigation of crimes.  Id. Salgado-Martinez previously qualified for the "highly discretionary program," DACA, based on

20

his educational attainments and life circumstances.  Id.[6]  While the government asserts that he had "limited employment history," Opp'n at 12, Salgado-Martinez was only twenty-two years old at the time of his conviction and has asserted that he worked part-time while in college.  Salgado-Martinez Decl. ¶ 13.

The Ninth Circuit has held that courts should "focus on whether [noncitizens] with similar circumstances received relief" when assessing plausibility as part of a prejudice inquiry under 8 U.S.C. § 1326(d).  United States v. Rojas-Pedroza, 716 F.3d 1253, 1263 (9th Cir. 2013); see also United States v. Vasquez-Gonzalez, 901 F.3d 1060, 1070 (9th Cir. 2018) (rejecting immigration attorney's opinion that the defendant had a "high probability" of relief because though it cited "some cases," it lacked discussion of cases involving individuals who had been "convicted of three crimes within a year, one of which was a stabbing," as the defendant had).  The Ninth Circuit has also recognized that, according to data compiled by the Department of Homeland Security, USCIS ultimately granted over 70 percent of U-visa applications between 2009 and 2015.  Cisneros-Rodriguez, 813 F.3d at 761 (citation omitted).  The Circuit has held that "statistics alone cannot establish the plausibility of relief," but that data can "provide[] a reasonable baseline against which to assess the plausibility of relief in [a defendant's] individual case."  Id. at 762 (citation omitted).  In Cisneros-Rodriguez, the Ninth Circuit concluded that the defendant could have plausibly been granted a U-visa and waiver despite "a substantial criminal record" including "a variety of state misdemeanors and felonies."  Id. at 759, 762.

At the motion hearing, the government argued that Salgado-Martinez did not provide adequate information about individuals with similar circumstances.  But in her reply declaration, Ms. Lawrence cites cases in which individuals with more serious criminal histories than Salgado-Martinez were granted waivers of inadmissibility in connection with U-visa applications.  See Lawrence Reply Decl. ¶¶ 4(c)(i)–(ii).  Ms. Lawrence discusses "a colleague who received an approved U-visa for a client with a California Penal Code § 211 conviction," the same conviction

---

[6] The government asserts that Salgado-Martinez was a "poor student," based on his high school grade point average.  See Opp'n at 12; see also School Records at 34 of 34.  This assessment is immaterial, particularly as Salgado-Martinez graduated from high school and attended some college.  See School Records at 33 of 34; see also High School Diploma.

as Salgado-Martinez. Id. ¶ 4(c)(i). "In that case, the person was convicted of felony robbery in tandem with felony false imprisonment, with an 8-month sentence." Id. That individual also received additional 90-day and 16-month sentences for probation violations for drug possession and prostitution, respectively. Id. Their other convictions included vehicle theft, theft, lewd public conduct, possession of a controlled substance, and sale of marijuana. Id. Mitigating factors in that case included that the individual was a transwoman in an abusive relationship who later demonstrated strong rehabilitation. Id. Ms. Lawrence also attests that she spoke to another colleague who obtained U-visa approval for a client who had been convicted of first-degree felony arson after burning a habitation. Id. ¶ 4(c)(ii). That applicant had two additional misdemeanor convictions and an immigration violation for illegal reentry after deportation. Id. In that case, mitigating factors included that the individual was sexually abused as a child and sexually assaulted by an immigration officer while in custody. Id. Salgado-Martinez appears to be on similar footing as these individuals.

The government asserts that because Salgado-Martinez was convicted of a "violent or dangerous" crime, he may receive a waiver only "in extraordinary circumstances." Opp'n at 11–13 (quoting 8 C.F.R. § 212.17(b)(2)). However, the government does not provide authority for its assertion that California Penal Code § 211 is automatically considered a "violent or dangerous" crime. To the contrary, the Ninth Circuit has held that California Penal Code § 211 is not considered a categorical crime of violence in the sentencing context. United States v. Bankston, 901 F.3d 1100, 1103–04 (9th Cir. 2018). Ms. Lawrence asserts that she has never seen USCIS apply the extraordinary circumstances standard to any of her U-visa cases with criminal history in eleven years. Lawrence Reply Decl. ¶ 4(c). She also states that she "reached out to nationwide listserves to speak with colleagues who had had the heightened standard applied to their U-visa cases, and no one responded with such experience." Id. Ms. Lawrence asserts that the standard was not applied to either the robbery or the arson case she cited. Id. ¶¶ 4(c)(i)–(ii). Accordingly, the Court concludes that USCIS likely would not have applied the extraordinary circumstances standard to Salgado-Martinez.

While Salgado-Martinez's robbery conviction and gang ties weigh against the potential

grant of a waiver, his conduct was not as serious as that of other individuals who were ultimately granted waivers.  See id.  Additionally, he could have explained his history in his U-visa application and would have emphasized several positive factors.  See id. ¶ 5(b).  The government argued at the motion hearing that USCIS might not have found that Salgado-Martinez merited a waiver for his robbery conviction.  That is not the test.  The Court concludes that USCIS could have plausibly exercised its discretion to grant Salgado-Martinez a waiver.  See Ubaldo-Figueroa, 364 F.3d at 1050.  Because he had a plausible ground for relief from deportation, Salgado-Martinez has demonstrated prejudice as a result of the defects in his underlying removal.

### B.       Denial of Opportunity for Judicial Review and Exhaustion of Administrative Remedies

Salgado-Martinez argues that, because he has established that he was denied his due process right to counsel, he was also denied the opportunity for meaningful judicial review and is excused from exhaustion of administrative remedies.  See MTD at 20.  The Ninth Circuit has held that "[a] defendant can establish the first two prongs of § 1326(d) by showing that he was denied judicial review of his removal proceeding in violation of due process."  Gomez, 757 F.3d at 892.  In Cisneros-Rodriguez, the Ninth Circuit found that the defendant had satisfied the first two prongs because her removal order was fundamentally unfair and her waiver of her right to counsel was invalid.  See 813 F.3d at 756.  Judge Freeman subsequently followed the Ninth Circuit's holding, finding that "[t]he law is clear that if [the defendant] demonstrates the third requirement under § 1326(d) then the first two requirements are also met."  United States v. Aguilar-Moya, No. 17-cr-00015-BLF-1, 2018 WL 3659304, at *4 (N.D. Cal. Aug. 2, 2018) (citing Cisneros-Rodriguez, 813 F.3d at 756).  The government devotes its briefing to the third prong and does not cite any contrary authority related to the first two prongs.

Because Salgado-Martinez satisfied the third prong of § 1326(d), he has also established the first two prongs—that he was denied judicial review and that he has exhausted all the administrative remedies available to him.  See Cisneros-Rodriguez, 813 F.3d at 756 ("If Cisneros's final order of removal was entered in violation of her due process rights, and if she

23

suffered prejudice as a result, she is deemed to have 'exhausted all administrative remedies available to [her]' and to have been deprived . . . of the opportunity for judicial review.'" (citations omitted)).

IV.     **CONCLUSION**

For the foregoing reasons, the Court GRANTS the motion and dismisses the indictment.

**IT IS SO ORDERED.**

Dated: August 19, 2020



CHARLES R. BREYER
United States District Judge